## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Matthew G. Wyatt, | : | Case No. 5:08CV2996 |
| | : | |
| Plaintiff | : | Judge Christopher Boyko |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND RECOMMENDED** |
| | : | **DECISION** |
| Defendant | : | |

This action pursuant to 42 U.S.C. §405(g) seeking judicial review of defendant's final determination denying plaintiff's claim for disability benefits, 42 U.S.C. §§416(i), 423, is pending decision upon the parties' submissions on the merits, pursuant to which plaintiff seeks entry of final judgment in his favor, alternatively, an order of remand, and defendant seeks final judgment upholding the decision below.

Plaintiff applied for benefits on June 2, 2005, alleging an onset date of November 20, 2004. In an accompanying Disability Report - Adult the questions "What are the illnesses, injuries or conditions that limit your ability to work?" and "How do your illnesses, injuries or conditions limit your ability to work?" were answered "Neck and back injury from a work injury" and "I can't sit for a long period of time or my feet and legs go numb.  If I stand for a long period of time or I get pains down my leg.  I can only sleep for two hours in bed, then I have to go sleep on the couch for a few hours.  I can't lift over ten pounds or I have a lot of pains in my back and legs from the work injury.  I sometimes use a cane to get up off a chair or I use it to hold myself up when I stand."

Upon denial of plaintiff's claim on the state agency level hearing <u>de</u> <u>novo</u> before an Administrative Law Judge (hereinafter ALJ) was requested.  Evidentiary hearing, at which plaintiff was represented by counsel, was held on April 23, 2008.  Also testifying at that proceeding was a vocational expert (VE), Mr. Thomas Dunleavy.[1]

At the hearing the plaintiff ascribed his alleged inability to work to physical factors, responding to the ALJ's question "Sir, what health problems are you having today that would interfere with your working?"  by stating "I have trouble sitting, standing, walking, standing too long.  I may end up, have to stand in the middle of this hearing due to the fact that I have, my fingers and toes and stuff fall asleep.  I have trouble with my neck and shoulders, different things like that causes problems."  Upon examination by his attorney on the subject of his pain the plaintiff testified:

> Q.    Okay.  You talked about pain, and let's talk about pain in your neck first.  Can you tell us exactly where that pain is in your neck?
>
> A.    I have it in my neck down across my shoulders.  Sometimes I have trouble holding my head up.  I have numbness in my fingers a lot of times.  Especially if I hold onto to a steering wheel or if I hold my hand in a certain position too long, then all the feeling in my fingers end up leaving until I let go of it and shake it off for about five, ten minutes or whatever it takes to get it off.
>
> Q.    All right.  This, this pain that you have in your neck, is that pain always there, or does it come and go?
>
> A.    It, it comes and goes.  Sometimes it comes in fatigue.  Sometimes it comes arthritis.  Other times it comes in a migraine headache.
>
> Q.    Are you ever pain free?
>
> A.    Very rare.
>
> Q.    On a regular day, on a normal day, and I'm sure your doctors have

---

[1]The hearing was conducted by video conference, with the ALJ in Oak Brook, Illinois and the plaintiff and his counsel in Cleveland, Ohio.  It is not clear from the record at which location the VE was.

talked about the pain scale, zero being no pain, ten being excruciating pain, on a, on a typical day, where would you rate your pain that you have in your neck?

A.     Three to five and sometimes a seven.

Q.     What makes it go to seven sometimes?

A.     Not being able to do anything as far as being able to do something physical like maybe, I don't know.  I'm not sure how I would even put it, but it just, it, I have to have some kind of physical or non-physical at times.  It just, it, it varies, but I do definitely have those problems.

On May 21, 2008 the ALJ entered his decision.  His "Findings of Fact and Conclusions of

Law" were:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.     The claimant has not engaged in substantial gainful activity since November 20, 2004, the alleged onset of disability (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.     The claimant has severe impairments: degenerative disc disease, diabetes mellitus, obstructive sleep apnea, and gastrointestinal esophageal reflux disease (20 CFR 404.1520(c)).

4.     The claimant's impairments do not meet or medically equal any listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     The claimant has the residual functional capacity to perform light work allowing alternating between sitting and standing positions every 30 minutes and not requiring lifting more than 10 pounds, and also subject to moderate limitations in the ability to understand, remember and carry out detailed instructions 20 CFR 404.1567(b).

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant, born on December 11, 1972 and 31 years old on the alleged disability onset date, is defined as a younger individual (20

3

CFR 404.1563).

8.    The claimant has a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because, irrespectively the Medical-Vocational rules provide a framework for a finding that the claimant is "not disabled" (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the economy that he can perform (20 CFR 404.1560(c) and 404.1566).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from November 20, 2004 through the date of this decision (20 CFR 404.1520(g)).

The ALJ's Finding No. 10 rests upon testimony of the VE, summarized in the ALJ's decision as follows:

> In response to a series of questions involving a hypothetical individual with claimant's work experience, education and age, the vocational expert testified that if the person had the residual functional capacity determined by the reviewing State Agency Physicians for claimant and allowing a restricted range of medium work (Exhibit 6-F) the person could not do past work but could adjust to jobs in Ohio (with their numbers) as follows: 15,000 packager jobs; 3,000 laundry workers jobs; and 20, 000 janitor cleaning jobs, even if the person had moderate limitation in the ability to understand, remember and carry out detailed instructions. The vocational expert indicated that if the person were limited to light work, he could do 4,000 packer jobs, 10,000 simple assembly jobs, and 5,000 office cleaner jobs. If limited in lifting to 10 pounds (as reported after the therapy evaluation on July 16, 2007 per Exhibit 13-F), he could still do half of the assembly jobs. If he also needed to alternate between sitting and standing every 30 minutes, he could do 3,000 assembly jobs and 5,000 visual inspector/sorter jobs.

The ALJ noted that "the functional capacity to perform a full range of light work includes the functional capacity to perform sedentary work as well," which is meaningful in this case in that the VE testified that a number of the jobs he identified were at the sedentary level and could be performed by an individual who required a sit/stand option.

4

On this appeal it is contended that the ALJ erred in failing to find that the plaintiff meets or equals Listing 12.05 of the Listing of Impairments and that the ALJ's finding that the plaintiff can perform a limited range of light work is not supported by substantial evidence.

Taking up the second of these contentions first, this Court finds that it fails insofar as the ALJ's ultimate finding that the plaintiff is not disabled is concerned. As previously stated, the ALJ correctly noted that the ability to perform light work activities, the level he found the plaintiff capable of performing, subsumes the ability to perform sedentary work activities, which only requires the ability to lift and carry ten pound weights. 20 C.F.R. §1567(a).  The vocational expert testified that an individual of the plaintiff's personal profile who was limited to sedentary work with a sit/stand option should be capable of performing assembly work, as to which there were 3,000 jobs statewide, and visual inspector, sorter, with 5,000 jobs statewide.  In finding the plaintiff not disabled the ALJ specifically included those jobs as within the plaintiff's capabilities.

The record contains a series of reports from Dr. Nicholas Varrate, the Medial Director of the Occupational Medicine Center of Tuscarawas County, in which the doctor stated that the plaintiff was capable of sedentary work.  See, R. 262-271, 280-285, 287-297.[2]

Therefore, even if the ALJ erred in finding the plaintiff capable of performing light, rather than sedentary, work activities, that would not alter his conclusion that the plaintiff is not disabled

---

[2]In support of his claim of disability the plaintiff relies, in part, upon a "Dear Sirs" letter dated August 13, 2006 from Dr. Joseph E. Bryan which states in part that he had been told by a Dr. Weiner that the plaintiff is "completely disabled" (whatever that may have meant), and that he agreed with that opinion. However, the only evidence in the record directly emanating from Dr. Mark Weiner is a letter to Dr. Bryan dated February 16, 2005 in which he stated "Matthew told me he wants to be considered disabled.  I told him that: (1) He is only three months status post surgery and will recover more.  (2) He does not appear to be disabled from all work to me.  He is up and walking around, and if he cannot do heavy, physical work; I am sure there are many other things he can do.  (3) I am not qualified to rate a disability.  (4) Social Security benefits office requires, I think, a year of being unable to work before considering a patient for disability. I would strongly encourage him to work.  If he is an otherwise capable 33-year old man.  I just can't imagine him sitting at home and collecting a government paycheck for the rest of his life."  (Emphasis added.)

based upon the ability to perform the jobs of assembly worker and/or visual inspector, sorter.

The plaintiff's alternative argument is that he should have been found disabled as meeting

or equaling Listing 12.05(C) of the Listings of Impairments, which provides:

> **12.05 Mental Retardation and Autism:** Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22).  (Note: The scores specified below refer to those obtained on the WAIS, and are used only for reference purposes.  Scores obtained on other standardized and individually administered tests are acceptable, but the numerical values obtained must indicate a similar level of intellectual functioning.). . .

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> **C.** A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function;

In support of the contention that he should be deemed disabled pursuant to Listing 12.05(C)

the plaintiff relies upon IQ testing performed in June 1982, when he was nine and a half years old,

which produced a verbal score of 75, a performance score of 69 and a full scale score of 70 (at least).

It must be noted that the report further states:

> Intellectually, based upon this estimate, Matt appears to be functioning in the slow learners range.  This functioning level suggests a learning expectancy level of mid first grade.  Matt's current grade placement is late second grade.  In examining Matt's performance on this instrument it appears that he is much stronger verbally as compared to the nonverbal test items, noting the verbal score of 75.  When one examines the previous intellectual estimates there seems to be a correlation in that this estimate is very similar to the scores gained on the WISC-R in the fall of this school year. Further, this verbal test score of 75 is very similar to the test score of 77 gained on the Stanford Binet in the fall of this year.  The Stanford Binet intelligence Scale is a highly verbal instrument.  Thus, one would expect a high correlation between the verbal test score on the

6

> WISC-R and the Stanford Binet Intelligence Scale.  The variability
> in the intellectual estimates could be due to Matt being on medication
> for some administrations while not on medication for other
> administrations.   Further, Matt seems to have much difficulty
> maintaining his attention.  This also could be interfering with the
> consistency of the scores.  (Emphasis added.)

In this Court's opinion this commentary can be read as casting some doubt on the reliability on the test scores as demonstrative of mental retardation.

The ALJ's response to the contention that the plaintiff should be deemed disabled under Listing 12.05(C) was "Counsel argued that the claimant's mental impairment meets the requisites of Listing 12.05 in Appendix I, citing claimant's IQ scores and orthopedic impairments.  However, the testimony is not indicative of a severe mental impairment for reasons which include claimant's ability to read blue prints and work history as a journeyman pipe fitter."  While as a pragmatic matter there may be a certain logic to this, it does not represent the critical analysis of the factors of Listing 12.05(C) which this reviewing court expects of a reasoned decision under the substantial evidence standard of Richardson v. Perales, 402 U.S. 309 (1971).

There is, however, a more cogent reason for rejecting plaintiff's argument.

Listing 112.00(D) provides in pertinent part:

> IQ test results must also be sufficiently current for accurate
> assessment under 112.05.  Generally, the results of IQ tests tend to
> stabilize by the age of 16.  Therefore, IQ test results obtained at age
> 16 or older should be viewed as a valid indication of the child's
> current status, provided they are compatible with the child's current
> behavior.  IQ test results obtained between ages 7 and 16 should be
> considered current for 4 years when the tested IQ is less than 40, and
> for 2 years when the IQ is 40 or above.

In December 1989, when he was a few days past seventeen years old, the plaintiff was again evaluated.  At that time his IQ scores were a verbal score of 82, a performance score of 89 and a full

scale score of 84, each of which is well beyond the levels specified in Listing 12.05(C).  As under

Listing 112.00(D) the 1989 IQ scores are deemed more reliable than those from 1982, it must be

concluded that the plaintiff cannot be deemed to satisfy Listing 12.05(C).

As this Court finds no merit in plaintiff's claims of error, it is recommended that the

defendant's final determination be affirmed, and judgment entered in the defendant's favor.


s/DAVID S. PERELMAN
United States Magistrate Judge


DATE:   August 3, 2010


## OBJECTIONS

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).